# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DANIELLE RUFF,
      Plaintiff,

       v.

ANDREW SAUL, Commissioner of Social
Security,
      Defendant.

No. 3:19-cv-01515 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Danielle Ruff moves to reverse the decision by the Social

Security Administration ("SSA") denying her claim for disability insurance benefits.  The

Commissioner of Social Security moves to affirm the decision.  For the reasons set forth below,

Ruff's Motion to for Judgment on the Pleadings (doc. no. 13) is DENIED and the

Commissioner's Motion to Affirm (doc. no. 19) is GRANTED.

## I.        Standard of Review

The SSA follows a five-step process to evaluate disability claims.  *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam).  First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity."  *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)).  Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental).  *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521).  Third, if the claimant does not have a severe

impairment, the Commissioner determines whether the impairment is considered "per se

disabling" under SSA regulations.  *Id*. (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  If

the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*,

722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts

### A.    Medical Background

#### 1.    *Dr. Mark Waynik*

On January 5, 2012, Ruff began treating with Dr. Mark Waynik. R. at 394. The progress notes indicate that Ruff had a history of bipolar disorder, anxiety and Attention Deficit Hyperactivity Disorder ("ADHD"). During the visit, however, Dr. Waynik observed that Ruff had a good affect and exhibited no symptoms of anxiety, depression or ADHD. *Id.* About three months later, on April 2, 2012, Ruff followed up with Dr. Waynik. R. at 396. In his treatment notes, Dr. Waynik noted that Ruff manifested symptoms of generalized anxiety, a depressed mood, insomnia, and loss of energy. *Id.* Despite her symptoms, Ruff exhibited a good affect. *Id.* Again, there was no mention of ADHD. Ruff reported that she had begun working a temporary position in a billing department, which she enjoyed. *Id.* Dr. Waynik concluded that Ruff was suffering from a generalized anxiety disorder and refilled her medications. R. at 396.

3

The following month, Ruff reported experiencing "ups and downs" as she dealt with a situation involving her teenage children and the Department of Children and Families. R. at 398. Dr. Waynik once again noted that Ruff exhibited a good affect. *Id.* Ruff's diagnosis remained the same and there were no changes made to either the type or the dosage of drugs prescribed. *Id.* In July 2012, Ruff's affect had changed somewhat due to a recent breakup with her live-in boyfriend. R. at 400. Dr. Waynik increased the dosage of Adderall from 10 mg to 15 mg. *Id.* In October, she continued to experience a depressed mood, hypersomnia, and loss of energy. R. at 402. Dr. Waynik observed that Ruff's concentration was "okay," but she was restless and "unable to relax." *Id.* He increased the dosage of Xanax from two pills per day to three pills per day. *Id.* In December 2012, Ruff reported that she was working forty hours a week. R. at 404. She also reported feeling tired and lamented not "social[izing] enough." *Id.* At the time, Ruff was not in therapy, and she was in the process of moving out of her boyfriend's home to a new place in Naugatuck. *Id.* Overall, Ruff's symptoms had remained relatively unchanged since July of 2012. R. at 400, 404.

In January 2013, Dr. Waynik noted that Ruff's "affect [was] [slightly] flattened." R. at 406. On the other hand, Ruff reported that she felt the "medicine [was] working." *Id.* Dr. Waynick's diagnoses and treatment remained the same. R. at 407. Two months later, Ruff reported feeling "good" and "lov[ing]" her move. R. at 408. According to the progress notes, Ruff did not exhibit any depressive or panic symptoms. *Id.* Between January 2013 and May 2013, Dr. Waynik increased Ruff's Xanax dosage to four pills a day and added an antidepressant to her prescriptive cocktail. R. at 406, 410. In May 2013, Ruff reported that the drug cocktail helped her focus and controlled her anxiety. R. at 410. Generally, her affect was good and her mood was stable. *Id.* In July 2013, Ruff was working forty hours a week. R. at 412. She felt

4

"okay" but tired. *Id.* The course of treatment did not change. By October, Ruff had lost her job for failing to follow procedures. R. at 414. Although she reported feeling anxious, she also stated that she was able to cope with the situation. *Id.*

In December 2013, Ruff's depression worsened after a series of particularly difficult life events. R. at 416. Ruff was depressed, crying, and unmotivated. *Id.* She experienced a change in appetite and a change in sleep pattern. There was, however, no evidence of suicidal ideation, homicidal ideation, self-injurious behavior, panic, or mania. *Id.* By February 2014, Ruff's symptoms had not abated; as a result, Dr. Waynik increased the dosage of her antidepressant. R. at 418–19. Two weeks later, Ruff was "snappy [and] irritable." R. at 420. Dr. Waynik changed her medication by decreasing the dose of the antidepressant and adding Neurontin. R. at 421. On March 10, 2014, Ruff reported feeling better. R. at 422. Dr. Waynik observed that she was not exhibiting symptoms of depression and her affect was appropriate. R. at 422–23. Because Ruff complained of an allergic reaction to her medication, Dr. Waynik substituted Lyrica for Neurontin. R. at 424. In mid-May, Ruff was "doing well," but she remained restless and irritable. R. at 426. At this time, Dr. Waynik revised his diagnosis to include ADHD, in addition to general anxiety disorder. R. at 428. He then changed Ruff's medications. R. at 428. At the end of May, Ruff experienced adverse side effects from the newly prescribed medications. R. at 429. Otherwise, she was "[d]oing well." *Id.* Ruff was well-groomed, alert and oriented. *Id.* Her mental status exam showed a stable mood, appropriate affect, coherent thought process, intact thought content, good insight to disorder, and no judgment impairment. *Id.* Dr. Waynik diagnosed Ruff with panic disorder without agoraphobia and encouraged her to utilize the skills learned in psychotherapy to help cope with stressors. R. at 429. In July 2014, Ruff reported that the medication was working well; however, she was still not sleeping well; sometimes became

irritable; and occasionally experienced panic attacks while out in public.  R. at 432.  Dr.

Waynik's examination showed that Ruff had a stable mood, reactive affect, normal speech,

adequate insight and judgment, and no overt psychosis or suicidal thoughts.  *Id.*  In August 2014,

Ruff reported that her medications were not working.  R. at 436.  She told Dr. Waynik that she

was anxious and had trouble sleeping.  *Id.*  As a result, Dr. Waynik changed her medications.  R.

at 438–39.  Progress notes from the visit indicate that Ruff had intact insight and judgment,

stable mood, normal speech and a reactive affect.  R. at 436.  In September, Ruff's condition had

stabilized.  R. at 440.  Her neurological examination was unremarkable and she reported that she

had been hired by the Board of Education.  *Id.*  By the following month, Ruff had suffered a

setback.  R. at 444.  She reported feeling stressed financially.  *Id.*  She also reported feeling

depressed, sleeping too much, as well as lacking drive or ambition.  *Id.*  The neurological

examination was, once again, unremarkable.  *Id.*  At this visit, Dr. Waynik changed her

medications and instructed Ruff to follow up with him in a month.  R. at 447.  Dr. Waynik

treated Ruff for the last time on November 6, 2014.  R. at 448.  Ruff complained that the

medication did not work.  *Id.*  She reported that she was not engaging in activities of daily living

because she was feeling "very depressed."  *Id.*  Dr. Waynik ordered new medications and

instructed Ruff to follow up in a week.  R. at 451.

### 2.  *Ryan Dillon, A.P.R.N.*

Between February 2015 and March 2018, Ruff saw Ryan Dillon ("Dillon"), an advanced

practice registered nurse ("APRN") for psychotherapy sessions, during which Ruff consistently

expressed feeling depressed and anxious about familial and financial stressors — i.e., arrests for

shoplifting, difficulties holding down a job, and troubled relationships with children and

extended family.  R. 452–535; 557–74; 606–23; 636–700.  Ruff also explained that she had

difficulty maintaining concentration and focus.  R. at 452, 460, 517.  In February 2015, Dillon

diagnosed Ruff with generalized anxiety and attention deficit disorder.  R. at 454.  During her

sessions, Ruff was generally alert and oriented to person, place, time, and situation.  R. 452–535;

557–74; 606–23; 636–700.  She consistently denied suicidal ideation and exhibited appropriate

grooming, normal speech, and intact thought process, thought content, associations, insight and

judgment.  *Id.*  At times, Ruff's mood and affect were stable and at other times anxious and

reactive.  *Id.*

In October 2016, Ruff reported feeling better following a change in her medication.  R. at

532.  Ironically, Ruff also reported that she was unable to conduct an in-person interview

because she was "worried about [her] disability."  *Id.*  Over the next few months, Dillon adjusted

Ruff's medications, including discontinuing her ADHD and anti-anxiety medication, as well as

decreasing the dose of her antidepressant medication.  R. at 565.  At Ruff's follow-up

appointment in June 2017, she complained that she was "very angry," had low energy, and had

developed "a fear of leaving home."  R. at 569.  As a result, Dillon added a new medication to

Ruff's drug cocktail.  R. at 571.

In December 2016, Dillon completed a Mental Impairment Questionnaire for Ruff's State

of Connecticut disability application, which was co-signed by Dr. Berkowitz.[1]  R. at 538.  Dillon

noted that Ruff presented with an anxious mood and affect; however, she was appropriately well

groomed, her judgment and insight were within normal limits, her cognitive status (orientation,

memory, attention and concentration) was within normal limits, and her thought content

(hallucinations, delusions, obsessions) was normal.  R. at 540.  He also noted that Ruff had a

"normal response to different psychotropic medications to control anxiety and depression."  R. at

---

[1] Dillon's opinion is cosigned by Dr. Berkowitz, but there are no records or other evidence to show that Dr. Berkowitz actually treated Ruff.

539.  In assessing activities of daily living, Dillon found that Ruff had a limited ability to use appropriate coping skills or handle frustration.  R. at 541.  In assessing social interaction, Dillon opined that Ruff frequently had problems respecting or responding appropriately to others in authority and persisting in simple activities without interruption from psychological symptoms. R. at 542.

On June 12, 2017, Dillon completed a more detailed psychological impairment questionnaire that was cosigned by Dr. Waynik.  R. at 626.  Ruff was diagnosed with major depressive disorder, general anxiety disorder, attention deficit disorder, and unspecified mood disorder.  R. at 626.  Dillon and Dr. Waynik noted that Ruff experienced symptoms of depression, anger, difficulty with concentration, social withdrawal, and decreased energy.  R. at 627.  The providers assessed Ruff's ability to perform work-related activities and found that she had mild to moderate limitations in several areas, as well as moderate to marked limitations in an array of mental activities, including understanding and memory, concentration and persistence, as well as adaptation.  R. at 629.

In July 2017, Ruff reported that she was not as angry, and she was feeling better.  R. at 574.  On August 7, 2017, Dillon documented that Ruff was exhibiting symptoms of ADHD — disorganization, distractibility, could not maintain focus, and could not complete tasks or assignments.  R. at 677.  Despite reporting that the medication cocktail helped control her anger, Ruff recounted an incident where she engaged in a physical altercation with a family member. *Id.*  In September 2017, Ruff reported feeling less anxious and described her depression symptoms as "minimal."  R. at 683.  In October 2017, Ruff said that the medications were helping but she still had trouble sleeping.  R. at 687.  In December, however, Ruff expressed "feeling more depressed [because she had] no money for [Christmas] shopping."  R. at 610.

8

Ruff gauged her anxiety level as a twelve on a scale of one to ten.  *Id.*  In response, Dillon adjusted Ruff's medications.  R. at 612.  At this point, Dillon documented that Ruff had applied for Social Security disability benefits and had engaged an attorney.  *Id.*

In February 2018, Ruff's condition had not improved.  R. at 614.  Dillon documented that Ruff was tired, tearful, restless, worried, and was experiencing insomnia and loss of concentration.  *Id.*  At that time, Dillon referred Ruff to a hospital for treatment.  R. at 616.  On February 22, 2018, Ruff was voluntarily admitted to Waterbury Hospital where she was observed for four days.  R. at 732.  She received a diagnosis of agoraphobia with panic disorder, and major depressive disorder that was recurrent and severe, without psychotic features.  R. at 734.  The records indicate that Ruff was pleasant with the staff, "laughing, joking and smiling throughout the admission interview."  R. at 740.  At the same time, however, Ruff commented that "she [felt] worthless and would rather be dead."  *Id.*  Ruff admitted having suicidal thoughts but no plan to act on them.  *Id.*  At some point, she informed staff that she had applied for and was denied SSDI, which led her to hire an attorney.  *Id.*  On February 26, 2018, Ruff was discharged.  R. at 741.

On March 26, 2018, Ruff followed up with Dillon.  R. at 619.  Her condition had not improved.  Her mood was depressed and anxious and her affect was reactive and tearful.  R. 619.  Ruff explained that she had accidentally walked out of CVS with a shopping cart full of items for which she had not paid.  R. 619.  Dillon changed Ruff's medication and added "attention deficit hyperactivity disorder, combined type," and "unspecified mood affective disorder" to Ruff's diagnosis.  R. at 623.

The record indicates that Ruff again visited the emergency department at Waterbury Hospital in April 2018.  R. at 728.  She presented with a chief complaint of depression but

denied experiencing any suicidal ideation, homicidal ideation or hallucinations.  R. at 728.

Ruff's mood and affect were depressed and tearful; however, she was alert and in no acute

distress.  R. at 730.  Within a few hours, she was reevaluated by a crisis worker who deemed

Ruff was stable enough for discharge home with her family.  *Id.*

### B.  Administrative Proceedings

Ruff filed an application for Supplemental Security Income benefits on September 8,

2016.  ALJ Decision, R. at 10.  In her application, Ruff alleged a disability onset date of May 1,

2016.  At the time of the alleged disability onset, Ruff was 41 years old.  Ruff identified her

disability as bipolar disorder, agoraphobia, anxiety disorder, depression, asthma, ulcers,

rheumatoid arthritis, bone problems, a triple fusion in her neck, allergies, and migraines.

Disability Report — Adult, Form SSA-3368, R. at 242.  The SSA initially denied her claim on

April 21, 2017, and again on reconsideration on August 7, 2017, finding that Ruff's "condition

[was] not severe enough to keep [her] from working."  Notice of Disapproved Claim, R. at 129.

Ruff then requested a hearing before an Administrative Law Judge ("ALJ") which was held on

October 9, 2018.  Tr. of ALJ Hr'g, R. at 26.

### C.  Hearing

On October 9, 2018 a hearing was held before Administrative Law Judge ("ALJ")

Alexander Peter Borre.  At the hearing, Ruff testified that she is a forty-three-year-old, single

mother of two children over the age of eighteen.  Tr. of ALJ Hr'g, R. at 34–35.  She testified that

she has not worked since 2016 because she suffers from agoraphobia.  *Id.* at 40.  Ruff testified

that she lives with her two daughters and her granddaughter, but she is not a caregiver for her

granddaughter.  *Id.* at 35   She testified that she receives State Administered General Assistance

("SAGA") as her only source of income.  *Id.*  Ruff testified that she suffers from COPD,

agoraphobia, depression, anxiety, and an inability to focus.  *Id.* at 40–41.  She also testified that

she takes multiple medications to treat her conditions.  Ruff explained that she experiences

various side effects from the medications, including weight gain, drowsiness and an inability to

focus.  *Id.* at 42.  Despite her COPD diagnosis, Ruff acknowledged that she smokes half a pack

of cigarettes per day to calm her panic attacks.  *Id.* at 46–47.

Ruff testified that for the past eighteen years she has received ongoing treatment and

medication for her mental health issues.  *Id.* at 54.  At the hearing, Ruff submitted new evidence

of psychiatric hospitalizations following two alleged suicide attempts in February and April

2018.[2]  *Id.* at 30, 54.  Following her hospitalizations, Ruff began outpatient therapy at Waterbury

Hospital Behavioral Health.  *Id.* at 45–46.  Ruff testified that she saw a behavioral health

specialist once a month, or once every two months.  *Id.* at 46.  She testified that she keeps her

medical appointments and takes her medication.  *Id.* at 55.

Ruff testified that her main problem is that she has difficulty concentrating and

maintaining focus.  *Id.*  For example, she testified that she cannot watch an entire movie, read a

book, or engage in a conversation without losing focus.  *Id.*  Ruff also testified that she

experiences panic attacks every day that last approximately ten minutes each.  *Id.* at 48.  As a

result, her daily activities are limited to light housekeeping, occasional grocery shopping, taking

care of pets, and engaging in arts and crafts.  *Id.* at 50.  She clarified, however, that she does not

finish tasks and frequently naps during the day.  *Id.* at 48–49.  Ruff claims that she does not

shower or change clothes unless prompted by her daughters.  *Id.* at 51–52.

---

[2] There is no record of Ruff attempting suicide in February or April.  Ruff was "sent to the ED for evaluation by her
APRN at the Waynick Group" because she "[had] suicidal thoughts but no plan at present."  R. at 740.  On February
22, 2018, Ruff was voluntarily admitted to the hospital and discharged four days later.  *Id.*  In April 2018, there was
another emergency room visit to Waterbury Hospital but there is no documentation of a suicide attempt.  Ruff was
discharged the same day.  R. at 730.

The ALJ also heard testimony from Vocational Expert Dennis King ("King").  *Id.* at 56. The ALJ asked King to classify Ruff's past relevant work as an administrative assistant, a billing and collections specialist, a cashier, a teacher assistant, a flower arranger, and a primary caretaker.  *Id.* at 37–39.  King classified the administrative assistant position and the billing clerk position as sedentary.  *Id.* at 58.  He then classified the flower arranger position and the cashier position as light.  *Id.*  Finally, he classified the childcare provider position and the personal care attendant position as medium.  *Id.*  The ALJ then asked King to consider a hypothetical individual of Ruff's age and educational level who is limited to light exertional level, except this individual could not climb ladders, ropes or scaffolds or tolerate exposure to workplace hazards, such as open moving machinery or unprotected heights.  Additionally, the individual could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could tolerate occasional exposure to temperature and humidity extremes, but no concentrated exposure to dust, gas, fumes, or other types of environmental irritants.  Finally, the individual could perform simple and repetitive tasks in an environment that did not require interaction with the public, and could engage in only occasional interaction with coworkers and supervisors.  *Id.*  King replied that the hypothetical individual would not be able to perform any of Ruff's past jobs.  *Id.* at 59. On the other hand, the hypothetical individual would be able to perform the following light, unskilled work: (1) garment sorter; (2) laundry worker; and (3) solderer.[3]  *Id.*

For the second hypothetical, the ALJ asked King to assume the hypothetical individual would consistently miss work approximately twice a month, and would be off-task

---

[3] The Vocational Expert defined the positions as follows:  Garment Sorter, Dictionary of Occupational Titles (DOT) DOT 222.687-014, with 45,000 positions available in the United States; Laundry Worker, DOT 302.685-010, with 420,100 positions available in the United States; and Solderer, DOT 813.684-0222, with 404,800 positions available in the United States.

approximately 15 percent of the workday due to a lack of focus.  *Id.* at 60.  King testified that the hypothetical individual would be unemployable from any competitive work.  *Id.*

D.  The ALJ's Decision

On October 19, 2018, the ALJ issued an opinion in which he found that Ruff was not "under a disability within the meaning of the Social Security Act from May 1, 2016, through the date of this decision."  ALJ Decision, R. at 11.  At the first step, the ALJ found that Ruff "ha[d] not engaged in substantial gainful activity since May 1, 2016, the alleged onset date."  *Id.* at 12. At the second step, the ALJ determined that Ruff's impairments of "asthma, arrhythmia, anxiety disorder, and major depressive disorder" were severe impairments that "significantly limit[ed] [her] ability to perform basic work activities."  *Id.*  At the third step, the ALJ determined that Ruff "[did] not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments."  ALJ Decision, R. at 13.  In making that finding, the ALJ considered whether Ruff's physical impairments met or medically equaled listing sections 3.03 (asthma-adulthood) and 4.05 (recurrent arrhythmias).  *Id.*  The ALJ determined that Ruff's physical impairments did not meet the requirements of the Listing of Impairments[4] because the severity of her asthma did not satisfy the requirements of the listing and the record contained essentially normal cardiac findings.  *Id.*  The ALJ also determined that Ruff's mental impairments did not meet or medically equal the criteria of listings 12.04 (depressive, bipolar and related disorders) or 12.06 (anxiety related disorder).  *Id.*  In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied, and he determined that they were not, because the mental impairments did not result in at least two "marked" limitations or one "extreme" limitation as required by the listing.  *Id.*

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ then assessed Ruff's residual functional capacity and found that she could "perform light work" with certain limitations. *Id*. at 14. The ALJ found that Ruff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; tolerate occasional exposure to temperature and humidity extremes; but, could not tolerate concentrated exposure to dusts, gas, and fumes. *Id.* The ALJ also found that Ruff could "perform simple and repetitive tasks in an environment that does not call for interaction with the public and only occasional interaction with coworkers and supervisors." *Id.*

The ALJ determined that Ruff's "medically determinable impairments could reasonably be expected to produce the . . . alleged symptoms; however, [Ruff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." ALJ Decision, R. at 15. As a result, Ruff's statements were found to be inconsistent with the objective evidence, which according to the ALJ, did not support the level of limitation alleged. *Id.*

At the fourth step, the ALJ determined that Ruff could not perform her past relevant work. *Id*. at 18. At the fifth step, the ALJ determined that, based on Ruff's age, education, work experience, and residual functional capacity, "there [were] jobs that exist[ed] in significant numbers in the national economy that [Ruff could] perform." *Id*. Because the ALJ found that Ruff was capable of making a successful adjustment to other work, he concluded that "a finding of 'not disabled' [was] therefore appropriate" and denied Ruff's request for disability benefits. *Id*. at 19.

## II. Discussion

Ruff contends on appeal that the ALJ wrongly discounted the opinions of her treating psychiatrists and discredited her own testimony. Specifically, she faults the ALJ for failing to

give proper weight to the opinions of Dr. Waynik, Dr. Berkowitz and ARNP Dillon; improperly

according greater weight to the opinions of the state agency consultants; and failing to properly

evaluate her subjective statements of disability.  I will address each issue in turn.

A.  Issue One – ALJ's Weighting of Medical Evidence

Ruff claims that the ALJ erred by "rejecting the opinions from treating psychiatrists Drs.

Waynik and Berkowitz, and treating nurse Dillon."  Pl's Memo., Doc. 14, p. 2.  In particular,

Ruff takes issue with the ALJ's dismissal of a Mental Impairment Questionnaire dated December

2016 and another dated June 2017.  She argues that the ALJ discounted both questionnaires and

did not cite specifically to the objective evidence in the medical record that led him to reject the

opinions.  The Commissioner argues that the ALJ "resolved a conflict in the evidence by giving

more weight to the opinions of Dr. Leib and Dr. Phillips, which he found were more consistent

with the record as a whole, than the joint opinions of Dr. Waynick/Nurse Dillon and Dr.

Berkowitz/Nurse Dillon."  Def's Memo., Doc. 19-1, p. 5.  In support of his argument, the

Commissioner references the opinions of Dr. Leib, Dr. Phillips and Dr. Kogan, as well as

numerous pages in the transcript that he contends support the ALJ's conclusion.  *Id.,* p. 7–8.  The

issues for my review are (1) whether substantial evidence supports the ALJ's factual findings,

and (2) whether the ALJ applied the correct legal standard.  *Pollard v. Halter*, 377 F.3d 183, 188

(2d Cir. 2004) (quoting *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)).

1. *Dr. Berkowitz/A.P.R.N. Dillon*

I turn first to the ALJ's treatment of the opinion of Dr. Berkowitz.[5]  The medical

questionnaire dated December 2016 was filled out by Dillon and co-signed by Dr. Berkowitz.  R.

at 543.  The government correctly notes that, although Ruff refers to Dr. Berkowitz as a treating

psychiatrist, he never examined or treated her during the relevant period.  Def's Memo., Doc. 19-

1, p. 11.  In fact, there is no indication that Dr. Berkowitz examined or treated Ruff at all before

signing the questionnaire.  The first and only mention of Dr. Berkowitz is his signature on the

mental impairment questionnaire that requires the co-signature of a supervising "M.D., D.O. or

psychologist."  R. 543.  Because there is no evidence that Dr. Berkowitz ever treated Ruff, his

opinion is not entitled to the deference afforded to treating physicians.

Generally speaking, "medical source statements co-signed by a treating physician should

be evaluated as having been the treating physician's opinion" unless there is evidence that the

report does not reflect the doctor's views.  *Gandino v. Comm'r of Soc. Sec.*, 2018 WL 1033287,

at *7 (N.D.N.Y. Feb. 22, 2018); *See also Djuzo v. Comm'r of Soc. Sec.*, 2014 WL 5823104, at *4

(N.D.N.Y. Nov. 7, 2014).  "The co-signature of a non-treating acceptable medical source alone

does not transform the opinion of a treating non-acceptable medical source into one with

controlling weight as a matter of law."  *Novaco v. Berryhill*, 2019 WL 1404189, at *10 (D.

Conn. Mar. 28, 2019).  "The co-signing acceptable medical source . . . must also be a 'treating'

provider for the claimant; i.e., he or she must actually provide some level of regular treatment to

the claimant."  *Id.* (citing *Luna v. Colvin*, 2016 WL 4408987, at *6–7 (D. Conn. Aug. 17, 2016)).

The ALJ is not required to consider Dr. Berkowitz a treating source simply because he signed the

---

[5] The government incorrectly refers to Dr. Berkowitz as Dr. Berlitz.  Def's Memo, Doc. 19-1, p. 9.  There being no
other reference to a Dr. Berlitz either in the medical record or the briefs, I assume that the government is referring to
Dr. Berkowitz.

December 2016 medical source statement; rather, the ALJ is required to consider the examining and treatment relationship between Dr. Berkowitz and Ruff. *King v. Comm'r of Soc. Sec.*, 350 F. Supp. 3d 277, 282 (W.D.N.Y. 2018). "It is a plaintiff's burden to supply evidence establishing a treating relationship, and if the record does not bear out such a relationship, the co-signed opinion is no more entitled to controlling weight than the opinion of any other non-treating physician." *Ward v. Comm'r of Soc. Sec.*, 2020 WL 3035850, at *4 (W.D.N.Y. June 5, 2020). Because Dr. Berkowitz never developed a physician/patient relationship with Ruff, his opinion was not entitled to the heightened consideration accorded to treating physicians. *See King*, 350 F. Supp. 3d at 282; *see also Mongeur*, 722 F.2d at 1039 n.2. Accordingly, I conclude that the ALJ applied the correct legal standard to the opinion of Dr. Berkowitz.

A.   Mental Impairment Questionnaire – December 2016

The more relevant question, then, is whether the ALJ erred by assigning partial weight to the opinion expressed in the questionnaire—an opinion presumably rendered by Nurse Dillon. R. at 539–43. Nurse Dillon did treat Ruff on a regular basis, and as a result, his opinion is entitled to some extra consideration. But the diagnosis of a nurse practitioner is not given the extra weight accorded a treating physician. *Mongeur*, 722 F.2d at 1039 n.2 ("the diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician."); *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (opinions of physician's assistant and nurse practitioner "do not demand the same deference as those of a treating physician."). Because Dillon is an advanced practice registered nurse, the treating physician rule does not apply to his opinion, which means that the ALJ had "discretion to determine the appropriate weight to accord [Dillon's] opinion based on all the evidence before him." *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995) (emphasis omitted); *see also* SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006)

(categorizing nurse practitioners as "other medical sources" distinct from "acceptable medical sources") (rescinded as of Mar. 27, 2017).[6]  I conclude, therefore, that the ALJ was not required to assign controlling weight to the functional assessment questionnaire dated December 2016, and the correct legal standard was applied.

Next, if the ALJ's decision was based on substantial evidence, I must affirm, regardless of whether the evidence would also support the opposite conclusion.  *See Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998).  Ruff argues that "the ALJ failed to provide even a scintilla of explanation for his conclusion that the opinions from the treating mental health sources are not supported by the longitudinal treatment record."  Pl's Memo., Doc. 14, p. 2.  She claims that "the Second Circuit requires an articulation of the underlying facts used to support a finding by an ALJ."  *Id.*  The Commissioner responds that the "ALJ discussed the relevant factors and provided good reasons for declining to give significant weight to the two joint opinions."  Def's Memo., Doc. 19-1, p. 10.  In particular, the ALJ found that Dillon's opinions "were not fully consistent with his observations of the claimant during counseling and medication management sessions."  ALJ Decision, R. at 17.  Although "other source" opinions are not given the extra weight accorded a treating physician, the opinions are analyzed using the same factors that apply to acceptable medical sources.  20 C.F.R. § 404.1527(c)(1) through (c)(6).  The Second Circuit, however, does not require a "slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004) (per curiam)).  That

---

[6]  For claims filed before March 27, 2017, the rules in 20 C.F.R. § 404.1527 apply.  For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.  Because Ruff's claim was filed in 2016, the Court applies the regulations that were in effect at the time of filing.  *See, e.g., Ogirri v. Berryhill*, 2018 WL 1115221, at *6 n.7 (S.D.N.Y. Feb. 28, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); *Rousey v. Comm'r of Social Sec.*, 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (same).

being said, the ALJ must consider several factors in determining how much weight an opinion should receive.  *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)).  Among those factors are: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129).  After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion."  *Burgess*, 537 F.3d at 129 (internal citations omitted).  Applying those principles to the present case, I conclude that the ALJ's discussion of the evidence, in conjunction with his citations to the record, is more than adequate to "permit [me] to glean the rationale of the ALJ's decision."  *See Mongeur*, 722 F.2d at 1040; *see also Fisher v. Bowen*, 869 F.3d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect [ALJ] opinion unless there is reason to believe that the remand might lead to a different result.").  Additionally, there is substantial evidence in the record to support an assignment of partial weight to the December 2016 statement.

With respect to the opinions expressed in the December 2016 questionnaire, the ALJ correctly noted that Dillon had a long treatment relationship with Ruff, and that the nature and extent of the treatment involved medication management and counseling.  ALJ Decision, R. at 17.  In the questionnaire, Dillon indicated that Ruff frequently had a problem (or "limited ability") in: (1) using appropriate coping skills; (2) handling frustration appropriately; (3) respecting/responding appropriately to others in authority; and (4) persisting in simple activities without interruption from psychological symptoms.  R. at 541–42.  The ALJ considered Dillon's opinion, but was ultimately dissuaded from assigning the opinion controlling weight because he

found it was inconsistent with other existing medical evidence in the record.  *Id.*  The ALJ

referenced four general sections of the medical record in support of his position.  *Id.*  In those

sections, there is evidence that Ruff's thought process, thought content, judgment and insight

were intact, and for the most part, Ruff denied experiencing any symptoms of ADHD.  R. at

453–77.  Overall, the treatment notes indicate that, from February 2015 to October 2016, Ruff

was cooperative with Dillon, compliant with her medications, and consistently kept her

appointments.  R. at 452–535.  The records offer a different perspective on Dillon's opinion that

Ruff could not persist in simple activities or respond appropriately to others in authority.

Ruff argues that the ALJ's opinion is not supported by substantial evidence because he

merely referenced unspecified findings in the treatment notes and those references are

insufficient to determine whether the treating source's opinion was properly rejected.  Ruff

claims that Dillon (and Dr. Berkowitz by virtue of his signature) "based his opinions on evidence

of an anxious mood and affect."  Pl's Memo., Doc. 14, p. 3.  She cites numerous pages of the

medical record that she claims provide substantial evidence of her abnormal mood and affect,

irritability, distractibility, decreased energy, psychomotor abnormalities/restlessness, social

withdrawal, and disturbed sleep.  Id.   Ruff's argument is not availing.  Her references to the

medical record add nothing new, but in effect reiterate the factors already considered by the ALJ

in formulating the RFC.  In his decision, the ALJ observed that:

> [Ruff had] a longstanding history of mental health treatment for anxiety and
> depression and her treatment records consistently included observations by
> treating and examining sources that she exhibit[ed] an anxious and depressed
> mood despite treatment compliance.  [He] considered her statements about her
> low motivation and difficulty focusing on daily tasks, by restricting her to
> performing simple and repetitive tasks.  [He] included social limitations in the
> mental residual functional capacity after considering her statements about the
> difficulty she experienced going out into the community, the necessity for
> someone to accompany her so she felt safe, and her limited social interactions
> with others along with her statements to treating sources about her mental

20

functioning. [He] also considered the observations . . . by the treating sources for
her anxiety and depression (Exhibits 3E, Exhibits 2F, 6F, SF, l0F and 12F).

ALJ Decision, R. at 17.

Unfortunately, the ALJ's decision to assign partial weight to Dillon's opinion is not a
model of clarity with only general references to the record.  *Id.*  Yet the failure to cite specific
evidence does not, by itself, require remand.  "An ALJ's failure to cite specific evidence does not
indicate that such evidence was not considered."  *Durante v. Colvin*, 2014 WL 4852881, at \*25
(D. Conn. Aug. 7, 2014), *recommended ruling approved and adopted*, 2014 WL 4843684 (D.
Conn. Sept. 29, 2014).  Hence, even though the ALJ does not cite specifically to the record, the
evidence is included in the record, and the ALJ makes a general reference to it.  Moreover, the
medical evidence supports the ALJ's decision, although he did fail to effectively explain the
connection.   It is well-established that where substantial evidence exists to support the
Commissioner's determination, the decision will be upheld, even if contrary evidence exists.
*DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (decision affirmed where there was
substantial evidence for both sides); *see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)
(Where there is substantial evidence to support either position, the determination is one to be
made by the factfinder.").  The substantial evidence standard, to reiterate from above, "means
once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would
have to conclude otherwise."  *Brault*, 683 F.3d at 448 (quotation marks and citation omitted)
(emphasis in original).  I conclude that substantial evidence supports the ALJ's finding.

### 2.  *Dr. Waynik/A.P.R.N. Dillon*

Ruff contends on appeal that the ALJ wrongly discounted the opinion of her treating
psychiatrist, Dr. Waynik.  Pl's Memo., Doc. 14, p. 2.  The opinion in question is a medical
questionnaire form that was completed by Dillon in June 2017, but this time co-signed by Dr.

21

Waynik—who had not treated, or even examined Ruff, for nearly three years.  R. at 626.  The

Commissioner argues that Dr. Waynik does not qualify as a "treating physician" given that he

never treated Ruff during the relevant period of disability.[7]  Def's Memo., Doc. 19-1, p. 11.  The

Commissioner's argument is partially correct.  "The treating physician rule . . . does not

technically apply when the physician was not the treating physician at all during the relevant

time period."  *Rogers v. Astrue*, 895 F. Supp. 2d 541, 549 (S.D.N.Y. 2012); *see also Arnone v.*

*Bowen*, 882 F.2d 34, 40–41 (2d Cir. 1989) (noting that the opinion of a physician who treated

plaintiff before the relevant period and who submitted an opinion thirteen years later was not

entitled to controlling weight); *Monette v. Astrue*, 269 F. App'x 109, 112 (2d Cir. 2008)

(summary order) (finding that the treating physician rule did not apply to a doctor who "was not

a treating physician during the period in contention.").  An exception to the rule exists in cases

where a current treating physician provides a retrospective opinion.  *Gustafson v. Berryhill*, 2019

WL 4744822, at *10 (D. Conn. Sept. 30, 2019) (finding that the opinion of a physician who had

not treated the claimant during the relevant time period, but had reestablished care was entitled to

"significant weight" as a retrospective opinion).  In those cases, the current treating physician's

retrospective "opinion is still entitled to significant weight."  *Chavis v. Astrue*, 2010 WL 624039,

*9 (N.D.N.Y. Feb. 18, 2010) (quoting *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981)).

That is not the case here.  Dr. Waynik did not treat Ruff during the relevant period of disability

and there is no evidence that he reestablished care in 2017, after a nearly three-year hiatus.  The

purpose of the treating physician rule is to "'give more weight to medical opinions from [the]

---

[7] "The relevant period" covers the time frame between the alleged onset date of disability and the date last insured.
*Lingenfelter v. Astrue*, 504 F.3d 1028, 1033 (9th Cir. 2007) (defining the "relevant time period" as the period
between the alleged onset date and the date disability insurance lapses).  Thus, for the purposes of this action, the
relevant period is May 1, 2016 to March 31, 2019.  R. at 63.  Dr. Waynik treated Ruff between January 2012 and
November 2014, well before her alleged onset of disability date of May 1, 2016.

treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [any] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.'" *Flynn v. Comm'r of Soc. Sec. Admin.*, 729 F. App'x 119, 122 (2d Cir. 2018) (quoting 20 C.F.R. § 404.1527).  Ruff faults the ALJ for assigning greater weight to the opinions of non-examining consultants than to Dr. Waynik and Dr. Berkowitz.  Pl's Memo., Doc. 14, p. 6. The problem with Ruff's position is that it ignores the fact that Dr. Berkowitz never treated Ruff and Dr. Waynik's last examination is so far removed from his current opinion that it fails to provide a "detailed, longitudinal view" of Ruff's impairments.  The ALJ, therefore, did not commit *per se* legal error in affording less weight to the medical opinion dated June 2017.

       a.   Psychiatric/Psychological Impairment Questionnaire – June 2017

Dr. Waynik and Dillon co-signed the Impairment Questionnaire dated June 12, 2017. R. at 625–30.  For the reasons stated above, the treating physician rule does not apply to the opinions contained in the questionnaire.  The remaining issue is whether the ALJ properly decided to assign only partial weight to the opinions of Ruff's treating providers.

When determining whether the Commissioner's decision is supported by substantial evidence, the court must consider the entire record, examining the evidence from both sides. *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  Substantial evidence need not compel the Commissioner's decision; rather substantial evidence need only be evidence that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotation marks and citations omitted). "Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks and citation omitted).

Ruff argues that the ALJ erred by not fully articulating his reasons for discounting the treating sources' opinions with specific citation to the medical record. Pl's Memo., Doc. 14, pp. 2–3. According to Ruff, the ALJ failed to explain "why the treatment records do not support the [the treating sources'] opinions." *Id.*, p. 3. The ALJ states that he gave the opinion less weight because it was contradicted by substantial medical evidence in the record, including "subsequent mental health treatment records [that] revealed her symptoms had improved with adjustments to psychiatric medications." ALJ Decision, R. at 17. In support, he points to exhibits 9F and 10F, which followed Ruff's progress from November 2016 to March 2018. R. at 636−700. Starting with the progress note dated November 2016, Dillon noted that Ruff was angry, restless and irritable; however, Ruff reported improved motivation with the addition of Latuda. R. at 636. In response, Dillon increased the dosage of the medication. During the visit, Ruff was well-groomed, her mood was stable, and her thought process, thought content, associations, judgment, and insight were intact. R. at 640. Through the end of the year, Dillon saw Ruff approximately every two weeks. For each visit, the progress notes are similar – sometimes the medication alleviated her symptoms but sometimes the drug cocktail required adjustments. R. at 636−48. By December 2016, Ruff reported that her anxiety was under control. R. at 648. Ruff had follow-up appointments with Dillon in January and March of 2017. During those appointments, Ruff reported high anxiety levels but otherwise she was "doing well." R. at 654, 660. Furthermore, her diagnosis remained unchanged.

In June 2017, Dillon documents, for the first time, that Ruff was dealing with agoraphobia and panic attacks. R. at 666. In response, Dillon adjusted Ruff's medications. R. at 668. The following month, Ruff reported that her anger and depression were "a little better," although she still felt anxious. R. at 671, 675. In August 2017, Dillon prescribed a new medication to treat the symptoms of attention deficit disorder. R. at 679. By September, Dillon reported "minimal depression," and less anxiety. R. at 683. During that visit, her main concern was an upcoming trip that required boarding a flight. *Id.* In October, Ruff stated that the new medication was working. R. at 687. In February 2018, Ruff reported that she was depressed, crying, unmotivated, and tired. R. at 691. Dillon documented that Ruff was not experiencing suicidal ideation and her mental status and ability to focus remained within normal limits. *Id.* Regardless, Dillon referred Ruff to Waterbury Hospital for follow up. R. at 694. At Waterbury Hospital, Ruff reported that she felt "worthless and [would] rather be dead." R. at 740. She also reported that she had been denied SSDI benefits, and as a result, had hired an attorney and was waiting for a hearing. *Id.* The intake counselor noted that Ruff was pleasant with the staff, and "[l]augh[ed], jok[ed], and smil[ed] throughout the admission interview." R. at 740. The hospital records reveal that Ruff was in a "bright mood," she denied any suicidal ideation, she was compliant with her medications, and her thought process was organized. *Id.* Ruff was voluntarily admitted to the hospital and discharged four days later. R. at 740–41. In March 2018, Ruff had stopped taking some of her medications. R. at 696. For the first time in more than a year, Dillon noted that Ruff was showing poor insight and judgment; as a result, Ruff's medications were adjusted. R. at 696–96. In April, Ruff returned to Waterbury Hospital with symptoms of depression. R. at 728. Although tearful and depressed, Ruff was alert, oriented, and cooperative. R. at 730. She was discharged the same day.

All in all, the record corroborates the ALJ's conclusion that following the June 2017 report there was evidence that Ruff's "symptoms improved with adjustments to psychiatric medications." ALJ Decision, R. at 17. Although there is some evidence that Ruff did not always respond to the treatment, and her medications required adjustment, there is also substantial evidence in the record that supports the ALJ's determination. Where the evidence is deemed susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). I therefore conclude, on the basis of the whole record, that the ALJ's decision to assign partial weight to Dr. Waynik and Nurse Dillon's June 2017 opinion was not error.

B. Consultant's Opinions

Ruff argues that the ALJ improperly accorded "great weight" to the opinions of non-examining consultants Drs. Warren Leib and Russell Phillips, while assigning "partial weight" to the opinions of her treating providers. Pl's Memo., Doc. 14, p. 5. Ruff claims that "[r]eliance on the non-examining consultant[s] was particularly egregious [because they] reviewed a limited medical record." *Id.*, p. 6. Specifically, Ruff argues that the non-examining consultants failed to take into consideration a psychiatric hospitalization and an emergency room visit that occurred in February and April of 2018, respectively. *Id.*, p. 6. What Ruff is essentially arguing is that the non-examining consultants' opinions were stale. On the other hand, the Commissioner argues that "both Dr. Leib and Dr. Phillips rendered their opinion during the relevant period and, therefore, their opinions were not 'stale.'" Def's Memo., Doc. 19-1, p. 7. The Commissioner also argues that "there is no evidence that [Ruff's] condition worsened over time, such that the opinions of Dr. Leib and Dr. Phillips did not reflect [Ruff's] more recent condition." *Id.*

26

Generally speaking, an ALJ must give greater weight to the medical opinions of treating and examining sources than to the medical opinions of non-treating and non-examining sources. 20 C.F.R. § 404.1527(c).  But because "psychological consultants are highly qualified and experts in Social Security disability evaluation," an ALJ may give weight to the medical opinion of non-examining consultants, if the opinion is supported by evidence in the record.  *Scott v. Berryhill*, 2018 WL 1608807, at *5 (D. Conn. Mar. 31, 2018) (citing 20 C.F.R. § 416.913a(b)(1)); *see also Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record."); *Wright v. Colvin*, 2017 WL 202171, at *6 (D. Conn. Jan. 18, 2017) (upholding the decision of the ALJ, and finding that a non-examining source opinion may be given greater weight if the opinion is more consistent with the record as a whole).  The issue here, however, is not whether the ALJ could give more weight to the opinion of a non-examining source, but instead whether that opinion was consistent with the record as a whole, given the subsequent hospital visits.

In *Camille v. Colvin*, the Second Circuit rejected an argument that a non-examining source was "stale" solely because that source failed to review later submitted evidence, and the "additional evidence [did] not raise doubts as to the reliability of [the non-examining source's] opinion." 652 F. App'x 25, 28 n.4 (2d Cir. 2016).  Because the additional evidence did not differ materially from the opinions that the non-examining physician did consider, the Second Circuit held that the ALJ committed no error by relying on the non-examining physician.  *Id.*  Here, similarly, the subsequent hospital visits did not reveal symptoms that were materially different from the symptoms considered by the non-examining physicians.  On February 22, 2018, Dillon referred Ruff to Waterbury Hospital following a therapy session in which Ruff was tearful and

depressed but expressed no suicidal ideation.  R. at 732.  At the hospital, Ruff was diagnosed

with "agoraphobia with panic disorder, [and] major depressive disorder [that was] recurrent

[and] severe without psychotic features."  R. at 734.  Ruff was voluntarily admitted to the

hospital and discharged after four days.  In April, Ruff again visited Waterbury Hospital where

she was diagnosed with depression without any associated symptoms or attempts at self-injury.

R. at 728.  This time, Ruff was not referred to the hospital by a treating provider.  Although

tearful, she was in no acute distress.  R. at 730.  Ruff indicated that the combination of a recent

change in medication and an upheaval in her living arrangements plunged her into a state of

depression.  R. at 728.  The emergency department physician, Dr. Brian Steiner, did not suspect

"acute somatic etiology"; and she was discharged the same day.  R. at 730.

In January 2017, Dr. Warren Leib considered similar symptomatology.  R. at 70.  Dr.

Leib considered the combined effect of all of Ruff's medically determinable impairments, which

included: "depressive, bipolar and related disorders"; "anxiety and obsessive-compulsive

disorders"; and "attention deficit/hyperactivity disorder."  R. at 69.  In August 2017, Dr. Phillips

evaluated Ruff's claims of "depressive, bipolar and related disorders," "anxiety and obsessive-

compulsive disorders," and limitations with sustained concentration and persistence.  R. at 101.

As the ALJ indicated, the medical evidence does not show a marked worsening of symptoms

after the opinions were issued.  If anything, the hospital records show more of the same—Ruff

was still experiencing symptoms of depression and she required monitoring, as well as

adjustments to her medications.  I am not persuaded that a reevaluation of the February and April

hospital records would have had a substantial effect on the outcome of either the non-examining

consultants' opinions or the ALJ's disability determination.  In his decision, the ALJ

acknowledged that Ruff's treatment had not fully resolved her symptoms and accounted for

those symptoms when determining the residual functional capacity.  Def's Memo., Doc. 19-1, p.

16.  As noted by the Commissioner, "[t]he ALJ . . .  incorporated [Ruff's testimony] that she had

difficulty focusing on tasks . . . by restricting her to performing simple and repetitive tasks; [and

he] incorporated [Ruff's] statement that she experienced difficulty going out into the community

. . . by restricting her to work that required no public contact and only occasional contact with

coworkers."  *Id.*, pp. 16−17.

Hence, the fact that the non-examining consultants' opinions were rendered without the

benefit of the entire medical record does not, in and of itself, preclude the ALJ from giving

significant weight to those opinions.  In this case, the additional evidence does not raise doubts

about the reliability of the consultants' opinions.  Therefore, the ALJ's weighing of the opinions

was proper.

C.   Issue Two – ALJ Erred Assessing Ruff's Credibility

The ALJ found that Ruff's statements concerning the intensity, persistence and limiting

effects of her symptoms was not entirely consistent with the medical evidence.  ALJ's Decision,

R. at 15.  The basis of Ruff's objection is that the ALJ's evaluation of her subjective statements

was not supported by substantial evidence.  Pl's Memo., Doc. 14, p. 8.  In support of his

credibility assessment, the ALJ identified five general sections of the medical record, which

unfortunately, offered little to connect Ruff's statements with specific, relevant inconsistencies.

R. at 16.  After reviewing the evidence both as referenced in the ALJ's decision and in toto, I

conclude that substantial evidence supports the ALJ's credibility findings.

Under SSA regulations, "[w]hen determining a claimant's [residual functional capacity],

the ALJ is required to take the claimant's reports of pain and other limitations into account."

*Genier*, 606 F.3d at 49.  The ALJ is not, however, "required to accept the claimant's subjective

complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id*. "Credibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are patently unreasonable." *Pietrunti v. Dir., Off. of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted); *see also Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("If the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."). When a discrepancy exists between the medical evidence and testimony, the ALJ is entitled to resolve that discrepancy. *See Veino*, 312 F.3d at 588 (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)).

Ruff testified that she suffers from debilitating panic attacks every day. Tr. of ALJ Hr'g, R. at 48. According to Ruff, the panic attacks last anywhere from ten seconds to ten minutes. *Id.* Substantial evidence in the record supports the ALJ's finding that Ruff's medical history did not "support the frequency of panic attacks she testified to at the hearing." ALJ Decision, R. at 16. Overall, the medical record shows a long history of depression and symptoms of ADHD, with only occasional complaints of panic attacks. R. at 429; 432; 666; 734. Ruff also provided conflicting testimony regarding the debilitating effects of her agoraphobia. On the one hand, Ruff testified that, on occasion, she did her own grocery shopping. *Id.*, at 49. On the other hand, Ruff testified that she "[would] not go shopping by [herself] . . . [or] go anywhere by [herself]." *Id.,* at 52. Ruff also testified that she feared open surroundings, as well as small and large spaces. Tr. of ALJ Hr'g, R. at 40. Yet, as recently as September 2017, she had been planning a trip that required flying. R. at 683. Despite the conflicting evidence, the ALJ "included social limitations" when determining Ruff's residual functional capacity. For example, the ALJ limited

Ruff to performing "light work" involving "simple and repetitive tasks in an environment that does not call for interaction with the public and only occasional interaction with coworkers and supervisors."  ALJ Decision, R. at 17.

It is not in the province of the District Court reviewing the decision of the ALJ to undertake anew the weighing of conflicting evidence.  Rather, I must look to whether the correct legal standard was applied and whether the record contains substantial evidence to support the ALJ's decision—irrespective of whether there are other decisions the ALJ might have made, or even whether I might have made another one myself.  The record has evidence of improvement and control of Ruff's symptoms.  It might be that Ruff would weigh that evidence differently than the ALJ did, regarding it as too slight or potentially temporary to be weighed more heavily, but even if I agreed, I would not be able on that basis to conclude that the ALJ's decision relied on an incorrect legal standard or was not supported by substantial evidence.  I do not consider the ALJ's credibility findings to have been "patently unreasonable" or unsupported by "substantial evidence," and therefore conclude that the ALJ did not err in his credibility finding here.  *See Pietrunti*, 119 F.3d at 1042; *Aponte*, 728 F.2d at 591.

### III.  Conclusion

For the reasons set forth above, Ruff's Motion for Judgment on the Pleadings (doc. no. 13) is DENIED, and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (doc. no. 19) is GRANTED.  The Clerk shall enter judgment and close the case.

So ordered.  Dated at Bridgeport, Connecticut, this 22nd day of October 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge